**THE BUSINESS ROUNDTABLE, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 88–1651.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 21, 1989.

Decided June 12, 1990.

Robert D. Rosenbaum, with whom Daniel A. Rezneck and Rebecca E. Swenson, Washington, D.C., were on the brief, for petitioner.

Jacob H. Stillman, Associate Gen. Counsel, S.E.C., with whom Daniel L. Goelzer, Gen. Counsel, Anne E. Chafer and Thomas L. Riesenberg, Asst. Gen. Counsels, and Paul Gonson, Sol., S.E.C., Washington, D.C., were on the brief, for respondent. Richard K. Kirby, Washington, D.C., also entered an appearance, for respondent.

Cordelia A. Glenn, Columbus, Ohio, with whom Daniel A. Malkoff, Youngstown, Ohio, was on the brief, for amici curiae, State of Ohio, et al., urging that Rule 19c–4 be declared invalid.

James Edward Maloney and Karen K. Hachler, were on the brief, for amicus curiae United Shareholders Ass'n, urging that Rule 19c–4 be affirmed.

Before EDWARDS, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

In 1984 General Motors announced a plan to issue a second class of common stock with one-half vote per share. The proposal collided with a longstanding rule of the New York Stock Exchange that required listed companies to provide one vote per share of common stock. The NYSE balked at enforcement, and after two years filed a proposal with the Securities and Exchange Commission to relax its own rule. The SEC did not approve the rule change but responded with one of its own. On July 7, 1988, it adopted Rule 19c–4, barring national securities exchanges and national securities associations, together known as self-regulatory organizations (SROs), from listing stock of a corporation that takes any corporate action "with the effect of nullifying, restricting or disparately reducing the per share voting rights of [existing common stockholders]." Voting Rights Listing Standards; Disenfranchisement Rule, 53 Fed.Reg. 26,376, 26,394 (1988) ("Final Rule"), codified at 17 CFR § 240.19c–4 (1990). The rule prohibits such "disenfranchisement" even where approved by a shareholder vote conducted on one share/one vote principles. Because the rule directly controls the substantive allocation of powers among classes of shareholders, we find it in excess of the Commission's authority under § 19 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), 15 U.S.C. § 78s (1988). Neither the wisdom of the requirement, nor of its being imposed at the federal level, is here in question.[1]

1. See Final Rule, 53 Fed.Reg. at 26,377–79; for academic commentary on the wisdom of the rule and of its federal adoption, see, e.g., Ronald J. Gilson, *Evaluating Dual Class Common Stock: The Relevance of Substitutes,* 73 Va.L.Rev. 807 (1987); Joel Seligman, *Equal Protection in Shareholder Voting Rights: The One Common Share, One Vote Controversy,* 54 Geo.Wash.L. Rev. 687 (1987) (arguing for a broad prohibition on all dual class capitalizations); George W. Dent, Jr., *Dual Class Capitalization: A Reply to Professor Seligman,* 54 Geo.Wash.L.Rev. 725, 754–55 (1986) (arguing the creation or sale of stock with disproportionate voting rights should be prohibited unless approved by a majority of disinterested shareholders); Louis Lowenstein, *Shareholder Voting Rights: A Response to SEC Rule 19c–4 and to Professor Gilson,* 89 Col.L. Rev. 979 (1989) (agreeing on the need to regulate dual class capitalizations but disagreeing with the methodology of the SEC's approach). For an exception to the general approval, see Daniel R. Fischel, *Organized Exchanges and the Regulation of Dual Class Common Stock,* 54 U.Chi.L.Rev. 119 (1987) (arguing that competition among securities markets will produce the most efficient rules).

On the matter before us, the SEC's authority, the academic commentary has been far more mixed, perhaps leaning to the negative. See Dent, 54 Geo.Wash.L.Rev. at 726–37 (Commission lacks authority); Comment, *Rule 19c–4: The SEC Goes Too Far in Adopting a One Share, One Vote Rule,* 83 Nw. U.L.Rev. 1057 (1989) (same); Richard A. Booth, *The Problem With Federal Tender Offer Law,* 77 Cal.L.Rev. 707, 760 n. 154 (1989) (Commission's authority is "questionable" because the rule does not further a purpose of the Exchange Act). Even proponents of the merits of the Rule generally concede that Commission's authority is uncertain. See Seligman, 54 Geo.Wash.L.Rev. at 714–19 (arguing the Exchange Act "probably empowers

In conducting our review, we assume that we owe the Commission deference under *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), even though the case might be characterized as involving a limit on the SEC's jurisdiction. Cf. *Mississippi Power & Light Co. v. Mississippi ex rel. Moore,* 487 U.S. 354, 108 S.Ct. 2428, 2444, 101 L.Ed.2d 322 (1988) (Scalia, J., concurring in the judgment) (questioning intelligibility of distinction between "an agency's exceeding its authority and an agency's exceeding authorized application of its authority"). This circuit has suggested that deference to an agency may be "inappropriate" in interpreting statutory provisions "delimiting its jurisdiction." *New York Shipping Ass'n v. Federal Maritime Comm'n,* 854 F.2d 1338, 1363 (D.C.Cir.1988) (alternative holding); see also *National Wildlife Fed'n v. ICC,* 850 F.2d 694, 699 n. 6 (D.C.Cir.1988). The Supreme Court cannot be said to have resolved the issue definitively. Compare *Mississippi Power & Light Co.,* 108 S.Ct. at 2444 ("it is plain that giving deference to an administrative interpretation of its statutory jurisdiction or authority is both necessary and appropriate") (Scalia, J., concurring in the judgment), and *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 845, 106 S.Ct. 3245, 3253–54, 92 L.Ed.2d 675 (1986) (agency's expertise is due substantial deference even when deciding issues that impinge on its jurisdiction), with *Mississippi Power & Light Co.,* 108 S.Ct. at 2446–47 (Brennan, J., dissenting) (deference is not appropriate for jurisdictional issues). See also Cass R. Sunstein, *Constitutionalism After the New Deal,* 101 Harv.L.Rev. 421, 467 (1987) (deference to administrators' decisions on scope of their own authority violates separation of powers principles dating back to *Marbury v. Madison,* 5 U.S. 137, 2 L.Ed. 60 (1803)); Note, *Coring the Seedless Grape: A Reinterpretation of* Chevron U.S.A. Inc. v. NRDC, 87 Col.L.Rev. 986, 1005–06 (1987) (courts should not defer to agency where

potential for "agency aggrandizement" exists); *Schwabacher v. United States,* 334 U.S. 182, 204, 68 S.Ct. 958, 969–70, 92 L.Ed. 1305 (1948) (Frankfurter, J., dissenting). Here we need not reach the issue as *Chevron* deference does not allow an agency "to alter the clearly expressed intent of Congress." *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 685–86, 88 L.Ed.2d 691 (1986). See also *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976). As we shall develop below, we find that the Exchange Act cannot be understood to include regulation of an issue that is so far beyond matters of disclosure (such as are regulated under § 14 of the Act), and of the management and practices of self-regulatory organizations, and that is concededly a part of corporate governance traditionally left to the states.

Two components of § 19 give the Commission authority over the rules of self-regulatory organizations. First, § 19(b) requires them to file with the Commission any proposed change in their rules. The Commission is to approve the change if it finds it "consistent with the requirements of [the Exchange Act] and the rules and regulations thereunder applicable" to the self-regulatory organization. § 19(b)(2), 15 U.S.C. § 78s(b)(2). This provision is not directly at issue here, but, as we shall see, both the procedure and the terms guiding Commission approval are important in understanding the scope of the authority the Commission has sought to exercise. That is found in § 19(c), which allows the Commission on its own initiative to amend the rules of a self-regulatory organization as it

> deems necessary or appropriate [1] to insure the fair administration of the self-regulatory organization, [2] to conform its rules to requirements of [the Exchange Act] and the rules and regula-

---

the SEC" to adopt such a rule, but conceding that the interpretation of the relevant statutory sections "is not free from doubt" and that a narrow reading of the key § 14 is "arguable"). At the very least, proponents concede the Com-

mission's exercise of this authority is "unprecedented regulation of corporate governance." Roberta S. Karmel, *Qualitative Standards For "Qualified Securities": SEC Regulation of Voting Rights,* 36 Cath.U.L.Rev. 809, 831 (1987).

tions thereunder applicable to such organization, or [3] *otherwise in furtherance of the purposes of [the Exchange Act].* § 19(c), 15 U.S.C. § 78s(c) (emphasis and enumeration added). As no one suggests that either of the first two purposes justifies Rule 19c–4, the issue before us is the scope of the third, catch-all provision.

First it seems indisputable that the NYSE's proposed rule modifying its one share/one vote listing standard is a "rule" covered by § 19(b) and, correspondingly, that Rule 19c–4 does not fall outside of § 19(c)'s ambit for any want of being a "rule of a self-regulatory organization." As enacted in 1934, § 19 of the Exchange Act gave the Commission power to amend the rules of an exchange "in respect of" 12 explicitly enumerated "matters," including "the listing or striking from listing of any security," and "similar matters." Securities Exchange Act of 1934, ch. 404, § 19(b), 48 Stat. 881, 898–99. The 1975 amendments to the Exchange Act, far from narrowing that authority, removed the enumeration and replaced it with a general power under new §§ 19(b) & (c) both to review and to amend all self-regulatory organization rules.[2] See Senate Subcommittee on Securities, Committee on Banking, Housing and Urban Affairs, *Securities Industry Study*, 93 Cong., 1st Sess. 163 (Comm. Print 1973) (*"Securities Industry Study"*) (object of amendments was to "giv[e] the Commission clear and effective jurisdiction over all self-regulatory rules").[3] See also S.Rep. No. 75, 94th Cong., 1st Sess. 131 (1975) ("1975 Senate Report"), U.S.Code Cong. & Admin.News 1975, 179 (similar).

The practice of the securities industry confirms the broad sweep of § 19(b)'s review mechanism. For the past fifteen years, the exchanges have routinely submitted changes in listing standards for approval and the Commission has reviewed them without any commenting party expressing doubt of its jurisdiction.[4] Indeed, exchanges followed this practice with the proposals that led directly to the regulations challenged here. See Proposed Rule Change by New York Stock Exchange, 51 Fed.Reg. 37,529 (1986) (proposal to eliminate one share/one vote policy); Proposed Rule Change by American Stock Exchange, 52 Fed.Reg. 1,574 (1987) (similar); Proposed Rule Change by the Pacific Stock Exchange, 52 Fed.Reg. 1,686 (1987) (similar). Many of the past proposals dealt with matters of internal corporate governance, but in no such case did the SEC seek

---

**2.** The term "rules of a self-regulatory organization" is defined broadly to include not just "the constitution, articles of incorporation, bylaws, and rules" of the organization, but even "such of the stated policies, practices, and interpretations" of the organization as the Commission "deem[s]" to be rules of the organization. Securities Acts Amendments of 1975, Pub.L. No. 94–29, § 3, 89 Stat. 97, 100, amending §§ 3(a)(27) and (a)(28), 15 U.S.C. §§ 78c(a)(27) and (a)(28). See also Final Rules, 53 Fed.Reg. at 26,390–91.

**3.** This study was the "genesis" of the 1975 legislation in the Senate, S.Rep. No. 75, 94th Cong., 1st Sess. 1 (1975), U.S.Code Cong. & Admin. News 1975, 179.

**4.** See New York Stock Exchange, Inc., 42 Fed. Reg. 14,793 (1977) (requiring independent auditor committee for listed companies); Pacific Stock Exchange, Inc., 44 Fed.Reg. 50,123 (1979) (one share/one vote rule and other voting rights requirements as detailed in proposal at 44 Fed. Reg. 38,037 (1979)); American Stock Exchange, Inc., 45 Fed.Reg. 24,740 (1980) (requiring at least two independent directors on corporate board); American Stock Exchange, Inc., 47 Fed. Reg. 53,541 (1982) (requiring shareholder approval for certain corporate transactions); New York Stock Exchange, 48 Fed.Reg. 57,393 (1983) (removing restriction on listing non-voting common stock of "quasi-governmental corporations"); Order Approving Proposed Rule Changes by the American Stock Exchange, Inc. and New York Stock Exchange, Inc., 52 Fed. Reg. 24,230 (1987) (amending listing standards for foreign companies); Order Approving Amendments to the Transaction Reporting Plan With Respect to NASDAQ/NMS Securities, 52 Fed.Reg. 24,234 (1987) (requirements as to independent directors, independent audit committee, shareholder quorum, and solicitation of proxies); Midwest Stock Exchange, Inc., 52 Fed. Reg. 36,657 (1987) (requiring two independent directors and independent audit committee); National Association of Securities Dealers, Inc., 54 Fed.Reg. 1,463 (1989) (removing requirement that interim reports be distributed to shareholders, and adding requirement of shareholder approval of certain corporate transactions); New York Stock Exchange, Inc., 54 Fed.Reg. 30,490 (1989) (shareholder approval requirements for certain transactions involving issuances of common stock).

to exercise its veto.[5] Accordingly, while the practice confirms that the "rules of a self-regulatory organization" required to be vetted by the Commission under § 19(b) are all-encompassing, it tells us nothing about the criteria of judgment the Commission may apply under subsection (b) or (c).

As mentioned above, the Commission does not suggest that it might support Rule 19c–4 by reference to the first two of the possible heads of jurisdiction in § 19(c)—assurance of fair administration of the self-regulatory organization itself and conformity to the requirements of the Exchange Act or rules thereunder applicable to the organization. Thus it is driven to the third—"otherwise in furtherance of the purposes" of the Exchange Act.

What then are the "purposes" of the Exchange Act? The Commission supports Rule 19c–4 as advancing the purposes of a variety of sections, see Final Rule, 53 Fed. Reg. at 26,390/1, but we first take its strongest—§ 14's grant of power to regulate the proxy process. The Commission finds a purpose "to ensure fair shareholder suffrage." See Final Rule, 53 Fed.Reg. at 26,391/2. Indeed, it points to the House Report's declarations that "[f]air corporate suffrage is an important right," H.R.Rep. No. 1383, 73d Cong., 2d Sess. 13 (1934) ("1934 House Report"), and that "use of the exchanges should involve a corresponding duty of according to shareholders fair suffrage," *id.* at 14. The formulation is true in the sense that Congress's decision can be located under that broad umbrella.

But unless the legislative purpose is defined by reference to the *means* Congress selected, it can be framed at *any* level of generality—to improve the operation of capital markets, for instance. In fact, although § 14(a) broadly bars use of the mails (and other means) "to solicit ... any proxy" in contravention of Commission rules and regulations, it is not seriously disputed that Congress's central concern was with disclosure. See *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964) ("The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation."); see also *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477–78, 97 S.Ct. 1292, 1302–04, 51 L.Ed.2d 480 (1977) (emphasizing Exchange Act's philosophy of full disclosure and dismissing the fairness of the terms of the transaction as "at most a tangential concern of the statute" once full and fair disclosure has occurred).

While the House Report indeed speaks of fair corporate suffrage, it also plainly identifies Congress's target—the solicitation of proxies by well informed insiders "without fairly informing the stockholders of the purposes for which the proxies are to be used." 1934 House Report at 14. The Senate Report contains no vague language about "corporate suffrage," but rather explains the purpose of the proxy protections as ensuring that stockholders have "adequate knowledge" about the "financial condition of the corporation ... [and] the major questions of policy, which are decided at stockholders' meetings." S.Rep. No. 792, 73d Cong., 2d Sess. 12 (1934) ("1934 Senate Report"). Finally, both reports agree on the power that the proxy sections gave the Commission—"power to control the conditions under which proxies may be solicited." 1934 House Report at 14. See also 1934 Senate Report at 12 (similar language).

That proxy regulation bears almost exclusively on disclosure stems as a matter of necessity from the nature of proxies. Proxy solicitations are, after all, only *communications* with potential absentee voters. The goal of federal proxy regulation was to improve those communications and thereby to enable proxy voters to control the corporation as effectively as they might have by attending a shareholder meeting. *Id.* See also S.Rep. No. 1455, 73d Cong., 2d Sess. 74 (1934); Sheldon E. Bernstein and Henry G. Fischer, *The Regulation of*

---

5. The Commission has on occasion, however, given hints that eventuated in the exchanges' proposing a change, a practice viewed by one observer as "regulation by raised eyebrow." See Donald E. Schwartz, *Federalism and Corporate Governance,* 45 Ohio St.L.J. 545, 571 (1984).

*the Solicitation of Proxies: Some Reflections on Corporate Democracy,* 7 U.Chi.L. Rev. 226, 227–28 (1940).

We do not mean to be taken as saying that disclosure is necessarily the sole subject of § 14. See Louis Loss, *Fundamentals of Securities Regulation* 452–53 (1988) (asserting that § 14 is not limited to ensuring disclosure), quoted in Final Rule, 53 Fed.Reg. at 26,391 n. 163; Karmel, 36 Cath. U.L.Rev. at 824 (similar). But see also Dent, 54 Geo.Wash.L.Rev. at 733–34 (§ 14 is primarily if not exclusively directed at disclosure); Comment, 83 Nw.U.L.Rev. at 1071 (similar). For example, the Commission's Rule 14a–4(b)(2) requires a proxy to provide some mechanism for a security holder to withhold authority to vote for each nominee individually. See 17 CFR § 240.14a–4(b)(2). It thus bars a kind of electoral tying arrangement, and may be supportable as a control over management's power to set the voting agenda, or, slightly more broadly, voting procedures. See generally, Dennis C. Mueller, *Public Choice* 38–58 (1979) (noting that difficulties inherent to majority voting, such as logrolling and cycling (in which different outcomes can be produced as coalitions reshape on successive votes), can increase the power of the agenda setter and lead to results that decrease the welfare of the voting community). But while Rule 14a–4(b)(2) may lie in a murky area between substance and procedure, Rule 19c–4 much more directly interferes with the substance of what the shareholders may enact. It prohibits certain reallocations of voting power and certain capital structures, even if approved by a shareholder vote subject to full disclosure and the most exacting procedural rules. See Voting Rights Listing Standards; Disenfranchisement Rule, 52 Fed.Reg. 23,665, 23,672/1 (1987) ("Proposed Rule"); Final Rule, 53 Fed.Reg. at 26,385/1–2.

The Commission noted in the preamble to the Proposed Rule its conviction that collective action problems could cause even a properly conducted shareholder vote (with ample disclosure and sound procedures) to bring about results injurious to the shareholders. See Proposed Rule, 52 Fed.Reg. at 23,672/1 (detailing collective action problem in the shareholder voting process and expressing "concern[ ]" over the "effect of that vote"). We do not question these findings. But we think the Commission's reliance on them is a clue to its stretch of the congressional purposes. As the Commission itself observed, "[s]ection 14(a) contains an implicit assumption that shareholders will be able to make use of the information provided in proxy solicitations in order to vote in corporate elections." Final Rule, 53 Fed.Reg. at 26,391/3. In 1934 Congress acted on the premise that shareholder voting could work, so long as investors secured enough information and, perhaps, the benefit of other procedural protections. It did not seek to regulate the stockholders' choices. If the Commission believes that premise misguided, it must turn to Congress.

With its step beyond control of voting procedure and into the distribution of voting power, the Commission would assume an authority that the Exchange Act's proponents disclaimed any intent to grant. Noting that opponents expressed alarm that the bill would give the Commission "power to interfere in the management of corporations," the Senate Committee on Banking and Currency said it had "no such intention" and that the bill "furnish[ed] no justification for such an interpretation." 1934 Senate Report at 10. See also H.R. Conf.Rep. No. 1838, 73d Cong., 2d Sess. 35 (1934) (deleting as unnecessary section 13(d) of the bill, which made explicit that the Commission could not "interfere with the management of the affairs of an issuer").

There are, of course, shadings within the notion of "management." With the present rule the Commission does not tell any corporation where to locate its next plant.[6] But neither does state corporate

---

**6.** The rule does, however, define presumptively valid transactions to include issuances of low-vote securities designed to effect a "bona fide"

merger or acquisition. Final Rule, 53 Fed.Reg. at 26,394/2 (19c–4(d)(3)). If this part of the rule could allow the Commission to pass on the

law; it regulates the distribution of powers among the various players in the process of corporate governance, and the Commission's present leap beyond disclosure is just that sort of regulation. The potpourri of listing standards previously submitted to the Commission under § 19(b), see note 4 above, suggests the sweep of its current claim. These govern requirements for independent directors, independent audit committees, shareholder quorums, shareholder approval for certain major corporate transactions, and other major issues traditionally governed by state law. If Rule 19c–4 is closely enough related to the proxy regulation purpose of § 14, then all these issues appear equally subject to the Commission's discretionary control.

Surprisingly, the Commission does not concede a lack of jurisdiction over such issues. When questioned at oral argument as to what state corporation rules are not related to "fair corporate suffrage," SEC counsel conceded only that further intrusions into state corporate governance "would present more difficult situations." Tr. of Oral Argument at 29 (Nov. 21, 1989). In fact the Commission's apparent perception of its § 19 powers has been immensely broad, unbounded even by any pretense of a connection to § 14. In reviewing the previous SRO rule changes on issues of independent directors and independent audit committees, it grounded its review in a supposed mandate to "protect investors and the public interest." Midwest Stock Exchange, Inc., 52 Fed.Reg. 36,657, 36,658/2 (1987). See also Order Approving Amendments to the Transaction Reporting Plan With Respect to NASDAQ/NMS Securities, 52 Fed.Reg. 24,234, 24,235/2 (1987). The Commission made no attempt to limit the concept by reference to the concrete purposes of any section. Rather,

it reasoned that the rule changes protected investors by "creat[ing] uniformity that helps to assure investors that all the companies traded in those markets have the fundamental safeguards they have come to expect of major companies." Midwest Stock Exchange, 52 Fed.Reg. at 36,658/1. If Rule 19c–4 were validated on such broad grounds, the Commission would be able to establish a federal corporate law by using access to national capital markets as its enforcement mechanism. This would resolve a longstanding controversy over the wisdom of such a move[7] in the face of disclaimers from Congress and with no substantive restraints on the power. It would, moreover, overturn or at least impinge severely on the tradition of state regulation of corporate law. As the Supreme Court has said, "[c]orporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation." *Sante Fe Industries*, 430 U.S. at 479, 97 S.Ct. at 1304 (emphasis in original, quoting *Cort v. Ash*, 422 U.S. 66, 84, 95 S.Ct. 2080, 2090–91, 45 L.Ed.2d 26 (1975)). At least one Commissioner shared this view, stating "[s]ection 19(c) does not provide the Commission *carte blanche* to adopt federal corporate governance standards through the back door by mandating uniform listing standards." Final Rule, 53 Fed.Reg. at 26,395/1 (Grundfest, Comm'r, concurring). See also Seligman, 54 Geo.Wash.L.Rev. at 715 (§ 19(c) "does not appear to authorize the SEC to amend SRO rules for the purpose of establishing a comprehensive federal corporation act (covering such matters as the number of directors or how many

---

merits of a corporate merger, then the Commission was asserting a quite radical power.

**7.** For an overview of this debate see Allen D. Boyer, *Federalism and Corporation Law: Drawing the Line in State Takeover Regulation,* 47 Ohio St.L.J. 1037, 1041–56 (1986). In 1934, ironically, the President of the New York Stock Exchange actually favored federalization of corporate law in an attempt to derail the momentum for federal regulation of the securities mar-

kets. See *id.* at 1051 n. 69; *Stock Exchange Practices: Hearings before the Senate Committee on Banking and Currency,* 73d Cong., 1st Sess., Pt. 15, 6715–16 (1934) (testimony of Richard Whitney, President of the New York Stock Exchange). Rule 19c–4 presents the worst of all possible worlds from that perspective, turning regulation of securities markets into the vehicle for federalizing corporate law.

shall be outsiders)"). We read the Act as reflecting a clear congressional determination not to make any such broad delegation of power to the Commission.

If the Commission's one share/one vote rule is to survive, then, some kind of firebreak is needed to separate it from corporate governance as a whole. But the Commission's sole suggestion of such a firebreak is a reference to "the unique historical background of the NYSE's one share, one vote rule." Brief for Respondent at 21 n. 24. It is true that in the Senate hearings leading to enactment of the Exchange Act there were a few favorable references to that rule. See *Stock Exchange Practices: Hearings before the Senate Committee on Banking and Currency*, 73d Cong., 1st Sess., Pt. 15, 6677 (1934) (testimony of Frank Altschul, Chairman of the NYSE Committee on Stock List); *id.* at 6779–80 (questioning of Frank Altschul by Ferdinand Pecora, Senate counsel). See also *id.* Pt. 2 at 661–62 (questioning of O.P. Van Sweringen, president of the Alleghany Corporation, by Ferdinand Pecora) (discussing a decision of the ICC denying a petition to merge several railroads on grounds that stockholders in one of the companies would be denied their vote). But these few references are culled from 9500 pages of testimony in the Senate hearings. No legislator directly discussed the NYSE's rule and no references were made to it in any of the Committee Reports. The most these references show is that legislators were aware of the rule and that it was an important part of the background. Even if we imputed the statements to a member of Congress, none comes near to saying, "The purposes of this act, although they generally will not involve the Commission in corporate governance, do include preservation of the one share/one vote principle." And even then we doubt that such a statement in the legislative history could support a special and anomalous exception to the Act's otherwise intelligible conceptual line excluding the Commission from corporate governance.

The Commission also rests on §§ 6(b)(5) and 15A(b)(6) for its broad vision of the Act's purposes. These sections, which contain identical language, allow the Commission in registering an exchange (§ 6(b)(5)) or an association of brokers and dealers (§ 15A(b)(6)) to consider whether its rules "in general, ... protect investors and the public interest." See 15 U.S.C. §§ 78f(b)(5), 78o–3(b)(6). This open-ended standard, however, is part of a larger list of more specific standards concerning the administration and operation of the self-regulatory organizations themselves, not the fairness of the issuers' corporate structures. Under one maxim of interpretation (*eiusdem generis*), the general standard at the end of this list should be construed to embrace only issues similar to the specific ones. But even if this canon is not applied, "public interest" is never an unbounded term. As the Supreme Court said in *NAACP v. FPC*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), rejecting a claim that the Federal Power Commission was authorized to oversee its licensees' compliance with civil rights legislation, broad "public interest" mandates must be limited to "the purposes Congress had in mind when it enacted [the] legislation." *Id.* at 670, 96 S.Ct. at 1812. Cf. *NLRB v. Financial Institution Employees*, 475 U.S. 192, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986); *Aaron v. SEC*, 446 U.S. 680, 695, 100 S.Ct. 1945, 1954–55, 64 L.Ed.2d 611 (1980) ("'generalized references to the "remedial purposes"' of the securities laws 'will not justify reading a provision "more broadly than its language and statutory scheme reasonably permit"'"). The current case follows a fortiori from *NAACP*. While there the Court declined to read the public interest mandate as allowing the agency to act as a co-enforcer of federal law, here the SEC's assertion of authority directly invades the "firmly established" state jurisdiction over corporate governance and shareholder voting rights. See *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 89, 107 S.Ct. 1637, 1649–50, 95 L.Ed.2d 67 (1987). Upholding the Commission's advance into an area not contemplated by Congress would circumvent the legislative process that is virtually the sole protection for state interests. Cf. *Garcia*

*v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 554, 105 S.Ct. 1005, 1019, 83 L.Ed.2d 1016 (1985) (limitation of federalism "is one of process rather than one of result"). The Supreme Court's point in a slightly different context is relevant here: "Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden." *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977).

Perhaps realizing that a vague "public interest" standard cannot be interpreted without some confining principle, the Commission attempted to relate §§ 6(b)(5) and 15A(b)(6) to "the policies implicit in the Act," specifically those in § 14. See Final Rule, 53 Fed.Reg. at 26,392/2; Proposed Rule, 52 Fed.Reg. at 23,676 n. 115. As this approach simply piggybacks on the Commission's flawed view of § 14, it must also fail.

We pause here to address a puzzle in the relation between § 19 and § 6(b)(5). Under the latter the Commission is not to register an exchange unless it determines that the exchange's rules "are not designed ... to regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Exchange Act] or the administration of the exchange." (Section 15A(b)(6) contains an identical standard for rules of an association of brokers and dealers.) If an exchange may *adopt* listing rules on one share/one vote or other corporate governance matters, must it not (under § 6(b)(5)) rest those rules on some relation to the purposes of the Exchange Act; and, if so, must not the Commission's authority under § 19(c) encompass every aspect of those rules?

We think the key here is the phrase "regulate by virtue of any authority conferred by [the Exchange Act]." The

government regulatory authority conferred by the Act is an exchange's power to expel, fine, bar from associating with members, and otherwise sanction *"its members and persons associated with its members."* [8] § 6(b)(6), 15 U.S.C. § 78f(b)(6); § 15A(b)(7), 15 U.S.C. § 78o–3(b)(7) (emphasis added). See also § 19(g)(1), 15 U.S.C. § 78s(g)(1) (imposing duty on self-regulatory organizations to "enforce compliance" with the Act and with their own rules by "its members and persons associated with its members"). Indeed this power is central to the concept of self-regulation, whereby the members of an association regulate *themselves,* subject to government oversight. See *Securities Industry Study* at 159 (quoting comments from the Department of Justice) ("Self-regulation can be a useful supplement to government regulation in disciplining members for fraud and dishonest commercial activities."); *id.* at 162 ("the authority by which the self-regulatory agencies limit and regulate the business activities of their members is delegated governmental authority"). Of course an exchange may delist an issuer and thus in some sense "enforce" its listing standards, but it still does not exercise any governmental authority to "regulate" the issuer. Thus Congress appears to have contemplated exchanges' taking (1) some measures that regulate members with delegated governmental authority and that are required to be, at a minimum, related to the purposes of the Act, and (2) others, that do not regulate members and do not rely on government regulatory authority, for which there is no such requirement. As we read the Act, both categories are subject to Commission review under § 19(b) and to amendment under § 19(c), but for some rules in the second category—those which do not regulate members and are not related to the purposes of the Act—the Commission's § 19 powers will be quite limited.

The legislative history of § 6(b)(5) confirms this reading. Section 6(c) of the original Exchange Act gave exchanges the power to "adopt[ ] and enforc[e] any rule

---

8. The term "person associated with a member" does not include issuers. § 3(a)(21), 15 U.S.C. § 78c(a)(21).

not inconsistent with" the Act. Securities Exchange Act of 1934, ch. 404, § 6(c), 48 Stat. 881, 886. The section permitted a class of exchange rules that regulated members in ways unrelated to the purposes of the Act—including matters such as the members' involvement in nonsecurities-related activities such as insurance. 1975 Senate Report at 28, 96, U.S.Code Cong. & Admin.News 1975, 206, 273–74; *Securities Industry Study* at 157–64. Such rules did not exercise federal regulatory power, and thus could not preempt state law. See *Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 131, 94 S.Ct. 383, 391–92, 38 L.Ed.2d 348 (1973) (holding an NYSE rule requiring arbitration of disputes between member firms and their employees did not "fall under the shadow of the federal umbrella" and could not preempt California law). The House proposal for the 1975 amendments sought to maintain the status quo of old § 6(c). See H.R.Rep. No. 123, 94th Cong., 1st Sess. 62 (1975) U.S.Code Cong. & Admin.News 1975, 179. The Senate, however, was hostile to § 6(c) and sought to cut off SRO interference with member firms' diversifying into other areas. See 1975 Senate Report at 28, U.S. Code Cong. & Admin.News 1975, 207; *Securities Industry Study* at 157–64. The Senate's limiting provision became law, but it is clear from both the Senate Report and Senate Subcommittee's *Securities Industry Study* that the limit was directed only at the exchanges' delegated regulatory power over their members. See 1975 Senate Report at 28, U.S.Code Cong. & Admin. News 1975, 207 (§ 6(b)(5) limits an exchange's "authority over their members"); *Securities Industry Study* at 163 ("the Exchange Act should be amended to limit the scope of a self-regulatory agency's authority over its members").

Finally the Commission invokes § 11A, which Congress added as part of the 1975 amendments to give the Commission authority to "facilitate the establishment of a national market system for securities." § 11A(a)(2), 15 U.S.C. § 78k–1(a)(2). In a preambular phrase, Congress found that it was "in the public interest ... to assure ... fair competition among brokers and dealers, among exchange markets, and between exchange markets and markets other than exchange markets." § 11A(a)(1)(C)(ii), 15 U.S.C. § 78k–1(a)(1)(C)(ii). The Commission here asserts that it is not "fair" for any self-regulatory organization "to compete for listings by lowering listing standards concerning shareholder voting rights" below a certain "minimum." Final Rule, 53 Fed.Reg. at 26,392/3–26,393/1. This reasoning—essentially that exchanges might engage in a "race to the bottom" in their competition to secure corporate listings—is again one that potentially engulfs all state corporate law. Indeed, if coupled with § 11A's express interest in fostering a national market system, the theory can easily federalize corporate law for all companies wishing access to the national capital markets. Yet nothing in the statute and legislative history suggests so broad a purpose.

The Commission points to a statement in the Conference Report supporting the view that § 11A gives authority "to remove unjustified disparities in regulation as may result in unfair competitive advantages." H.R.Conf.Rep. No. 229, 94th Cong., 1st Sess. 94 (1975) ("1975 Conference Report"), U.S.Code Cong. & Admin.News 1975, 179, 321, 325. The Committee was here discussing § 11A(c)(1)(F), which gives the Commission authority to "assure equal regulation of all markets for qualified securities and all exchange members, brokers, and dealers effecting transactions in such securities." In a vacuum, this section and its description in the legislative history could be seen as allowing SEC imposition of uniform rules as needed to forestall a race to the bottom. But the subtitle to the section of the Committee Report quoted is "Communication among and dissemination of information about securities markets," *id.* at 93, U.S.Code Cong. & Admin.News 1975, 324, and the section of which subsection 11A(c)(1)(F) is a part, § 11A(c)(1), concerns only the dissemination of "information with respect to quotations for or transactions in any security." The Conference Report made clear that this section dealt with "communications systems ... [that] will

form the heart of the national market system." [9] *Id.* The Senate Report gave a number of examples confirming its limited reach:

> Examples of the types of subjects as to which the SEC would have the authority to promulgate rules under these provisions include: the hours of operation of any type or quotation system, trading halts, what and how information is displayed and qualifications for the securities to be included on any tape or within any quotation system.

1975 Senate Report at 11, U.S.Code Cong. & Admin.News 1975, 189. Even the final element in this list, which may sound similar to listing standards, seems to refer only to the qualifications relevant to inclusion within any particular information database (e.g., amount of trading activity, type of security, etc.). See 1975 Conference Report at 92–93, U.S.Code Cong. & Admin. News 1975, 323–24 (both Houses intended that "all securities ... be eligible to be qualified for trading in the national market system," although the SEC may have to establish subsystems "tailored to the characteristics of the particular types of securities."). Indeed Congress made clear that the power to regulate central information processing was not intended to give the SEC "either the responsibility or the power to operate as an 'economic czar.'" 1975 Senate Report at 12, U.S.Code Cong. & Admin.News 1975, 190. To argue that Congress's "equal regulation" mandate supports SEC control over corporate governance through national listing standards is to gamble that the court will accept a Commission spin on a statutory fragment without even a glance at its context. Wrong court, bad gamble.

The Commission's theory is, moreover, a rather odd reading of what was a cornerstone in Congress's 1975 desire to establish a national market system and "to break down the unnecessary regulatory restrictions ... which restrain competition among markets and market makers." 1975 Senate Report at 12–13, U.S.Code Cong. & Admin. News 1975, 191. See also Jonathan R. Macey and David D. Haddock, *Shirking at the SEC: The Failure of the National Market System,* 1985 U.Ill.L.Rev. 315, 315 (1975 amendments were essentially "deregulatory legislation"); 1975 Conference Report at 94, U.S.Code Cong. & Admin.News 1975, 325 ("The Commission was directed to remove existing burdens on competition and to refrain from imposing, or permitting to be imposed, any new regulatory burden 'not necessary or appropriate in furtherance of the purposes' of the Exchange Act."). To the extent these congressional views recognize a continuing need for regulation, the need is predicated upon purposes found elsewhere in the Exchange Act, and thus provides no independent purpose to sustain Rule 19c–4.

The Commission also invokes its power under § 11A(a)(2) to "designate the securities or classes of securities qualified for trading in the national market system." 15 U.S.C. § 78k–1(a)(2). See Final Rule, 53 Fed.Reg. at 26,392/2–3. Even if we aggregated the individual exchanges into the "national market system" (which is doubtful, as they are only "components of the fragmented trading network that Congress wanted to reform," Dent, 54 Geo.Wash.L. Rev. at 732), the Commission's § 11A authority does not sustain its broad notion of the Exchange Act's purposes. The power to designate securities as "qualified" for trading on the national market system is necessarily constrained by Congress's purposes in authorizing the Commission to foster that system. See § 11A(a)(2), 15 U.S.C. § 78k–1(a)(2) (requiring Commission to use its authority "in accordance with the findings and to carry out the objectives set

---

9. For example, elements of the national market system that have been realized include the Composite Quotation System (which reports bid and offer prices from several exchanges and the over-the-counter market), the Intermarket Trading System (a computer system linking terminals on trading floors in major exchanges), and the Consolidated Tape (which reports transactions on the New York, American and some regional exchanges). See generally Donald L. Calvin, *The National Market System: A Successful Adventure in Industry Self–Improvement,* 70 Va.L.Rev. 785, 800–01 (1984).

forth in paragraph (1) of this subsection"); 1975 Conference Report at 92–95, U.S.Code Cong. & Admin.News 1975, 323–26. Cf. Karmel, 36 Cath. U.L.Rev. at 829. Again, the Commission has failed to identify in § 11A or its history a purpose justifying regulation of corporate governance.

\* \* \*

We do not decide whether the Commission could invoke other statutory provisions to provide the legal authority for promulgating these or similar regulations. The sections relied on here are insufficient. Even if other statutory provisions could support the Commission's asserted authority,[10] we cannot supply grounds to sustain the regulations that were not invoked by the Commission below. *SEC v. Chenery*, 318 U.S. 80, 92–95, 63 S.Ct. 454, 461–63, 87 L.Ed. 626 (1943); *Environmental Defense Fund, Inc. v. EPA*, 898 F.2d 183, 189 (D.C. Cir.1990) (applying *Chenery* principle to *Chevron* statutory analysis); cf. Stephen Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin.L.Rev. 363, 377–79 (1986) (criticizing increased procedural steps generated by *Chevron*). In any case, a change in the jurisdictional basis would almost certainly alter the substantive content of the final regulations.

The petition for review is granted and Rule 19c–4 is vacated.

*So ordered.*

---

**10.** Some commentators argued that the Commission could ground its authority in the Williams Act, § 14(d)–(f), 15 U.S.C. § 78n(d)–(f), see Karmel, 36 Cath.U.L.Rev. at 830, Seligman, 54 Geo.Wash.L.Rev. at 717, Proposed Rule, 52 Fed.Reg. at 23,670/1–2 (noting commentators' suggestion of the Williams Act as a basis for authority), but the Commission did not rely on these provisions.